[Crim. No. 9461. Third Dist. Jan. 5, 1978.]

THE PEOPLE, Plaintiff and Respondent, v.
HASTEN SNIDER, Defendant and Appellant.

■■■■■■■■■■■■■■■■■■■■

**COUNSEL**

Robert N. Chargin, Public Defender, and David Wellenbrock, Deputy Public Defender, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Joel E. Carey and Arthur G. Scotland, Deputy Attorneys General, Joseph H. Baker, District Attorney, and Gerald Wall, Deputy District Attorney, for Plaintiff and Respondent.

**OPINION**

**PARAS, J.**—This case was certified for transfer to this court under rule 63 of the California Rules of Court, after the Appellate Department of San Joaquin County Superior Court ruled that the municipal court should have granted defendant's motion to suppress evidence. Defendant is charged with use of heroin, a misdemeanor (Health & Saf. Code, § 11550).

# I

The following "Settled Statement of Facts on Appeal" was endorsed by the municipal court:

"Officer Horton testified that as he was driving west on Main Street on January 10, 1977, at approximately 11:20 p.m. he observed a car driven by the Defendant pull out of the parking lot between the Golden Gate Bar and the Burke Rooms. Officer Horton testified that this was an area of high narcotics usage. The car turned south on Stanislaus. Officer Horton observed that the right tail light showed white.

"Officer Horton made a traffic stop near the intersection of Washington and Stanislaus Streets. He had observed no improper driving conduct; the detention was based solely on the defective tail light (a mechanical violation).

"Officer Horton approached the driver's side of the car and at that time recognized the Defendant as someone he had talked with at the Metropolitan Narcotics Squad Officer [sic] three or four months before. Officer Horton also testified that the Defendant had previously been arrested for alleged violations of Health & Safety Code, Section 11550. However, Officer Horton did not testify as to any convictions the Defendant might have suffered or whether Officer Horton was aware of any convictions of the Defendant for any violations.

"Defendant was asked for his driver's license, which he produced. Officer Horton testified that at this time he informed the Defendant of the reason for the stop. Officer Horton had some recollection of the Defendant stating that the car did not belong to the Defendant. There was no request for the registration of the automobile. Defendant was friendly and cooperative.

"Officer Horton testified he leaned into the car. The car was illuminated by a spotlight on the police car (a marked black and white unit) and Officer Horton had a flashlight which he shined around inside the car, checking for offensive weapons. At the time of receiving the license, Officer Horton shined the light into Defendant's face, and Horton noted that Defendant's eyes were very constricted.

"Officer Horton testified that he noted the Defendant appeared normal except he had constricted eyes. No unusual odors were detected, including no odor of alcohol.

"Horton testified that Defendant was a 'known user.' Defense counsel objected to this as conclusionary. The objection was sustained and then Officer Horton testified that he had seen the Defendant in the Metropolitan Narcotics Team's office at the Police Facility several months ago being examined for narcotics. Horton offered no other testimony to establish that the Defendant was a 'known user' and did not testify as to the outcome of the examination he had seen in progress.

"Based on (1) the 'pinned eyes,' (2) the fact that the Defendant was coming from the area of the Golden Gate and the Burke Rooms, and (3) Officer Horton's knowledge of the Defendant and Defendant's reputation, Officer Horton concluded that the Defendant was under the influence of narcotics. He testified he then asked the Defendant to get out of the car. They proceeded back to the police car where Officer Horton made a more thorough examination of the Defendant. This involved shining his flashlight into Defendant's eyes and removing the light and determining whether the change in light caused any pupillary reaction. Officer Horton detected no reaction. Officer Horton then testified he asked the Defendant to roll up his sleeves and at that time 'marks' were observed. The Defendant was arrested.

"The time elapsed during the detention was five or six minutes, according to Officer Horton. He also testified that the Defendant and he examined the tail light, which he described as follows: A horizontal tail light with two bulbs in it; the left portion was not operable but the right portion was operable; that less than half of the lens was intact, and this was a slender piece which went across the operable bulb but did not cover it completely nor did it reach either end of the tail light aperture.

"No mechanical violation citation was issued.

"The Defendant, HASTEN SNIDER, took the stand and testified that he was stopped on January 10, 1977, by Officer Horton. He and Vernon Thompson had a drink at the Golden Gate and then were leaving. As they started to get into their car, three women asked for a ride to Conway and he agreed to give them a ride. The car belongs to Vernon Thompson.

"He drove out of the parking lot and turned west on Main Street. He then turned south on Stanislaus Street. He was then stopped near the intersection of Washington and Stanislaus Streets. The officer approached him and asked for his license, which he produced. He was asked to get out of the car. He thought he could refuse to get out of the car, but he cooperated. He was wearing a long-sleeved shirt and a

long-sleeved black sweater. The weather was chilly. Before getting out of the car, SNIDER testified that he was not informed of why he had been stopped.

"The two of them went back to the police car. Officer Horton examined the Defendant's eyes there without requesting permission or obtaining consent to examine the eyes. At this time he was informed of his rights and placed in the police car. SNIDER testified that his arms were not examined in the field nor did he and Officer Horton examine the tail light.

"Snider described the tail light (the car was a 1969 Ford station wagon) as being a two-bulb tail light, with one bulb over the other vertically. The top bulb had been removed because that portion of the lens was broken.

"Vernon Thompson testified that he was the owner of the car. He described the tail lights as being vertical. The passenger side tail light had a broken lens. The top half of the lens was missing and the bottom half was intact. The top bulb had been removed. One bulb is for the turn signals and one is for the brake lights.

"The trial court made the following findings: (a) The initial detention was valid. (b) The examination of Defendant's eyes with the flashlight did not constitute a search; rather, this was a 'plain view' examination as it was dark outside and the flashlight simply provided illumination only. (c) There was no consent by the Defendant to the examination of his arms. (d) The officer had probable cause to examine Defendant's arms (that is, to conduct a search) when he saw constricted eyes, he knew the Defendant to be a 'known user,' and he saw Defendant coming from an area of high narcotics usage. (e) There had been an examination of the Defendant's arms in the field.

"It was stipulated that there was no arrest or search warrant and that Officer Horton was an expert as to use and under the influence of narcotics."

■■■ Defendant contends that the examination of his eyes was a search without probable cause, that the "plain view" doctrine does not apply, and that *People* v. *Benedict* (1969) 2 Cal.App.3d 400 [82 Cal.Rptr. 759], and *People* v. *Ochoa* (1970) 9 Cal.App.3d 500 [88 Cal.Rptr. 399], are not controlling.

## II

In *People* v. *Benedict, supra,* 2 Cal.App.3d 400, the officer asked the defendant for identification, then directed a flashlight into the defendant's eyes. He observed constricted pupils which did not react to light. The court concluded that this was "[a] phenomenon . . . *in plain sight of the officer* and observed by him *without any semblance of a search or seizure*; his use of a flashlight to observe the pupillary reaction was not improper. *The utilization of the light from a flashlight directed to that which is in plain sight ordinarily does not render observation thereof a search.*" (Italics added.) (*Id.* at pp. 403-404.)

In *People* v. *Ochoa, supra,* 9 Cal.App.3d 500, the officer approached the defendant on the street after a tip from a reliable confidential informant that the defendant was dealing in narcotics. Noticing that the pupils of defendant's eyes were constricted, he placed his hand over them " 'to shadow the pupil area.' " (9 Cal.App.3d at p. 502.) When the pupils did not react but remained constricted, the officer placed defendant under arrest for being under the influence of narcotics. The court held: "On these facts we do not have the slightest doubt that the officer was within his rights in arresting and searching defendant, and we would be belaboring the obvious if we cited authority for the proposition. We assume that when the officers first saw defendant they had no right to arrest him on the basis of the information they had received which was arguably somewhat stale. We also accept that, without more, [the officer] would not have been privileged to shade defendant's eyes. While having police officers approach one on the street and conduct such examinations in public is not as serious an intrusion as a pat down for weapons, it can be, to say the least, embarrassing. We hold, however, that *the intervening observations of the constricted pupils furnished the officer with an adequate basis for subjecting* defendant to this indignity." (Italics added.) (9 Cal.App.3d at p. 503.)

We agree with defendant that the quoted portion of the *Benedict* opinion is dictum, because the defendant in that case apparently did not raise this issue, and thereby waived any objection to the evidence of pupillary reaction in challenging a subsequent search of his arms. We also tend to agree that the analogy in *Ochoa* to a pat-down search may be inappropriate, since such a search is normally justified by the need to protect the safety of the officers, not by probable cause. A more appropriate analogy could be the typical roadside "sobriety test" to which a suspected drunk driver may be subjected. (See *People* v. *Olson*

(1971) 18 Cal.App.3d 592, 598 [96 Cal.Rptr. 132], in which such a test was given to a nondriver under the influence of drugs.)

But we disagree with defendant's all-or-nothing characterization that "*Ochoa* must be viewed as holding that there was probable cause to search Ochoa's eyes *before* the shading occurred, or *Ochoa* must *be viewed* as wrongly decided." (Italics added.) ■ Such logomachy ignores well-settled principles, implicitly relied upon in *Ochoa,* which recognize that there are degrees of cause short of "probable" cause which justify progressively greater intrusions on privacy, short of "searches," as progressively greater cause for investigation accumulates. (See *People* v. *Moreno* (1977) 67 Cal.App.3d 962 [134 Cal.Rptr. 322]; *People* v. *Gale* (1973) 9 Cal.3d 788 [108 Cal.Rptr. 852, 511 P.2d 1204].)

■ Defendant does not and cannot argue that once a vehicle is stopped for a valid police purpose (here the broken taillight) the officer cannot shine his flashlight on the occupants. The apparent initial reason for illumination of defendant's face was to compare it to his likeness in the photograph on the driver's license. It was at this time, before the conduct of any tests, that the officer observed defendant's "pinned eyes." At that point, as defendant admits, the officer had three pieces of relevant information: (1) defendant had come from a high narcotics area; (2) defendant had been in the metropolitan narcotics team's office several months earlier being examined for narcotics, and (3) defendant's eyes were constricted. Defendant attempts to isolate each of these pieces of information, thus minimizing their cumulative effect. But of course, it was their concurrence as to this one defendant at one point in time that affected the action of the officer. It was enough to justify the additional intrusion upon defendant's privacy entailed in the flashlight eye test.

The municipal court's order denying the motion to suppress is affirmed.

Puglia, P. J., and Janes, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied March 2, 1978.